Rel: November 1, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2024-2025

_____

### CL-2024-0344

_____

### R.D.

### v.

### G.A.W. II

### Appeal from Jackson Juvenile Court
### (JU-23-363.01)

_____

### CL-2024-0345

_____

### R.D.

### v.

### G.A.W. II

### Appeal from Jackson Juvenile Court

**(JU-23-364.01)**

PER CURIAM.

R.D. ("the mother") appeals from separate judgments entered by the Jackson Juvenile Court ("the juvenile court") that terminated her parental rights to C.W., whose date of birth is January 12, 2012, and G.A.W. III, whose date of birth is September 14, 2014, (collectively "the children"). We reverse the juvenile court's judgments.

Procedural History

Before the commencement of the termination-of-parental-rights actions that are presently on appeal, the children were involved in divorce proceedings in the Jackson Circuit Court ("the circuit court") between the mother and G.A.W. II ("the father"), wherein issues of visitation and custody were decided. On September 24, 2019, the circuit court awarded the father sole physical custody of the children. On August 22, 2023, the father filed in the juvenile court separate but nearly identical petitions to terminate the parental rights of the mother on the basis that, since September 24, 2019, she had been incarcerated, had been living in a rehab facility or living in halfway houses, and had not consistently visited or supported the children. The juvenile court held a

trial on the father's termination-of-parental-rights petitions on April 9, 2024.

On April 25, 2024, the juvenile court entered judgments terminating the parental rights of the mother as to both children. Those judgments set forth the following specific findings of fact:

"Upon consideration of the testimony and evidence presented at the hearing and a review of the court file, the Court finds that the Mother … has not and is unwilling to fulfill the responsibilities or perform the duties necessary to be a parent to th[e] child[ren].

"The Court finds that there is no viable parent-child bond between the parent and child[ren]. The Mother flat lied to this court during her direct examination about where she lived of all things. The court now has an extremely hard time believing the mother[']s claims of sobriety and clean living.

"The mother clearly does not do well with authority and following court orders, rather she does things her way. This in great part has led to her visitation being suspended by the Circuit Court. The Mother has made very little effort or progress toward reunify[ing her]self with the child[ren]. The Mother has made little to no effort to visit with the child[ren] or establish any relationship with the child[ren]. The Mother[']s lack of visitation is … a direct result of the Mother[']s conduct and her visitation with the children having been suspended by the Circuit Court in the parent[']s divorce action. The Mother has provide[d] no support and only a few gifts to the child[ren]. The Court finds that this condition has existed for an extended period of time and is unlikely to change in the foreseeable future.

"Therefore, this Court will GRANT the Petition for Termination of Parental Rights for said child[ren] on the Mother and it is hereby ORDERED, ADJUDGED and DECREED as follows:

"1. The child[ren are] under the age of eighteen (18) years and under the jurisdiction of this Court.

"2. The Mother has failed to provide for the material needs of the child[ren] in that she has: failed to adapt her lifestyle or adjust her circumstances to take care of the child[ren]; failed to maintain consistent in person visitation; failed to provide consistent support for the child[ren]; failed to establish a relationship or form a bond with the child[ren].

"3. There is clear and convincing evidence, competent, material and relevant in nature, by which it has been established that th[e] child[ren are] dependent … as to the Mother and that the Mother is unable or unwilling to discharge her responsibilities to and for the child[ren].

"Furthermore, there is clear and convincing evidence, competent, material and relevant in nature that the conduct or condition of the Mother is such as to render her unable to properly care for the child[ren] and that such conduct or condition is unlikely to change in the foreseeable future. Th[e] child[ren are] dependent as to the Mother.

"4. There are no viable alternatives to the termination of parental rights and reunification with the Mother is not possible. It is in the best interests of th[e] child[ren] that the parental rights be terminated.

"5. The Parental Rights of the Mother … with regard to these children … are hereby permanently terminated.

"6. The Father … is awarded the legal and physical care, custody and control of the minor children … and is authorized

> to do all things necessary to protect and preserve the health, safety and welfare of the child[ren]."

(Capitalization in original.) The mother filed notices of appeal on May 8, 2024, and this court consolidated her appeals ex mero motu on May 14, 2024.

## Evidence

The evidence from the April 9, 2024, trial on the father's termination-of-parental-rights petitions indicates the following. After seven years of marriage, the mother and the father divorced in 2018. At that time, they were awarded joint custody of the children. In May 2018, the mother pleaded guilty to three criminal charges: unlawful possession of drug paraphernalia, driving under the influence of a controlled substance, and illegal possession of prescription drugs. As a result of those convictions, the mother was placed on probation, and she completed 18 months of color-code drug testing through the court-referral program of Jackson County ("the court-referral program").

On June 26, 2019, the mother was arrested and charged with illegal possession of prescription drugs. Based on that arrest, the district attorney's office filed a motion to revoke her probation. On September 17, 2019, the Jackson Circuit Court placed the mother under house arrest

and ordered her to participate in the court-referral program and to complete an assessment for drug rehabilitation.

Based on the mother's 2019 arrest, the father also filed in the divorce action an ex parte petition for modification of the circuit court's previous custody arrangement. His petition was granted, and the mother's visitation was suspended. According to the father's petitions to terminate the mother's parental rights, the circuit court awarded him sole physical custody of the children on September 24, 2019.

On October 21, 2019, the mother tested positive for oxycodone and failed to provide a prescription for that drug. At some point, she also left her residence without permission. As a result, in November 2019, the district attorney's office filed two motions to revoke the mother's house arrest and probation. The mother testified that, as a result of the disposition of those motions, she was required to go to jail.

The mother stated that she was released from jail and began substance-abuse treatment in 2020. According to the mother, in compliance with the court-referral program, she completed a 21-day drug-rehabilitation program, after which she moved into a halfway house in Nashville, Tennessee, where she lived for 90 days. She then acquired

an apartment in Nashville, although she still had a home in Section, Alabama, so she "would go back and forth between them, with the kids."

On March 29, 2021, the circuit court granted the mother unsupervised visitation with the children. The mother testified that, in 2021, she left Nashville and moved into an apartment in Scottsboro for a year. According to the mother, she was arrested twice for driving under the influence after leaving Nashville. She was also arrested again for drug-related offenses. While living in Scottsboro, the mother was arrested for selling fentanyl; however, she testified that she ended up pleading guilty to the possession of a controlled substance, i.e., Xanax, after that arrest. The mother testified that she had a legal prescription for Xanax at the time and was arrested merely for having her pills outside of the bottle.

The father testified that, around the time of the mother's arrest for selling fentanyl, the children told him that the mother took them to a "drug house," told them that they could not come in, and left them in the car. In 2022, after the mother's lease for the apartment in Scottsboro ended, she moved in with her sister in Stevenson.

7

On October 17, 2022, the circuit court entered an order pursuant to a visitation agreement between the parties. At some point, the unsupervised visitation the mother had been awarded on March 29, 2021, was suspended. In the October 17, 2022, order, the circuit court restored the mother's unsupervised visitation.

The mother testified that, from October 17, 2022, until January 2023, she had visitation with the children every other week for seven days at a time. The mother testified that, during that time, she provided for the children's material needs and paid for their sports activities.

The mother testified that her visitation with the children terminated in January 2023 because of "[a] disagreement between [her] and [the father] and his wife." First, the mother stated that the disagreement was caused, in part, by her drug use; however, later, she admitted explicitly that her visitation with the children ended in January 2023 because of her drug use. The mother admitted that she had continued to abuse her prescription medication even after her visitation was restored in October 2022.

The mother testified that, in January and February 2023, she provided the children with new clothing and shoes. The father testified

that that clothing was the only thing that the mother had given the children in 2023.

In March 2023, the mother filed a motion in the circuit court to again modify visitation. However, on April 3, 2023, the mother was arrested for driving under the influence and for possession of a controlled substance. Based on that arrest, the father filed a motion in the circuit court to suspend the mother's visitation with the children. On April 6, 2023, after a hearing, the circuit court granted that motion, but it allowed the mother to continue having telephonic visitation with the children. The circuit court also ordered the mother to submit to drug testing through the court-referral program, submit to an evaluation for substance abuse by the court-referral program, and submit to a mental-health evaluation at Mountain Lakes Behavioral Healthcare ("Mountain Lakes"). The mother was directed to complete the care recommended by the administrators at Mountain Lakes.

The mother admitted that she never completed a mental health evaluation at Mountain Lakes and that she had chosen to go to a different facility instead. The mother testified that she began an eight-day detoxification from drugs at a hospital on April 11, 2023. According to

9

the mother, although it followed an arrest, her decision to begin the detoxification was voluntary and was not court ordered. She stated that her detoxification facility sent paperwork to the court-referral program explaining that she had entered treatment on her own. She admitted that she had never submitted to drug testing or enrolled in a color-code testing program through the court-referral program as ordered by the circuit court.

On April 19, 2023, the mother entered The Father's House, a sober-living facility. She testified that The Father's House was recommended by the detoxification facility that she had chosen, but she acknowledged that neither of those programs had been recommended by the court-referral program. The mother testified that, in May 2023, she did not provide the children with any material support because she had been in treatment and had not been allowed to work; however, in June 2023, she purchased the children new clothes.

The mother testified that, after entering The Father's House, she filed in the circuit court a motion for visitation on the basis that she had enrolled herself in a substance-abuse treatment program. On June 1, 2023, the circuit court held a hearing on the mother's request. However,

before an order could be entered, the mother was "unsuccessfully discharged from The Father's House on 06/19/2023 … for inappropriate relationships with other clients," according to a letter addressed to the circuit court and signed by the director of The Father's House.

According to the mother, she was sober when she left The Father's House and was not dismissed for failure to pass a drug test. She testified that she was dismissed from The Father's House "for a letter from another woman." She stated that she had "never even received the letter."

The mother testified that, for the two months she was at The Father's House, from April to June 2023, she did not comply with the circuit court's order that she participate in programs through the court-referral program because the facility handled all such matters for the residents. According to the mother, The Father's House did not have her appointments through the court-referral program scheduled. The mother admitted that, even after she left The Father's House, she never attended programs through the court-referral program. The mother testified that, two weeks before the trial in this case in April 2024, she telephoned the office of the court-referral program to make an appointment. She stated,

11

however, that she had been told to call back and had not yet done so; therefore, she said, she had not been evaluated or drug tested as of the date of the trial. The mother testified that she had paperwork showing that she "was somewhere taking drug tests," although she admitted that it was not through the court-referral program.

According to the mother, as soon as she was dismissed from The Father's House, she went to the Jackson County courthouse and "put it in writing to [the circuit court]" that she was moving to a different facility. On June 27, 2023, after the hearing on her visitation request, the circuit court entered an order awarding the mother three types of visitation: in-person visitation every third Sunday during church, visitation by phone for a maximum of 15 minutes per day, and in-person visitation at the Gathering Place in Fort Payne when she could obtain a pass to leave her sober-living facility. The visitation was awarded on the conditions that the mother submit to color-code drug testing, be evaluated for participation in Family Wellness Court, and comply with the terms of her probation.

However, just hours later, the circuit court entered an order stating, "[t]he court is now informed that the mother left her prior placement at

The Father's House … and [has] gone to a facility in Chattanooga, Tennessee." Because, the court stated, it was unfamiliar with the mother's new facility, it vacated its prior order, except for the allowance of phone calls, visitation at the Gathering Place, and its mandate that the mother participate in drug testing. The mother testified that her in-person visitation was terminated entirely in June 2023. According to her, The Gathering Place could not facilitate visitation between her and the children due to a lack of funding for after-school visits. The father testified that the lack of visits was a result of the mother's own failure to contact The Gathering Place to schedule them.

The father testified that the last scheduled visitation before the trial in April 2024 was some time in 2023 and that he had planned to take the children to the church on that Sunday to meet the mother; however, that visitation never took place because he was notified that the mother had been dismissed from The Father's House.

The mother testified that she entered a sober-living facility called Oxford House in Chattanooga, Tennessee, on June 28, 2023. The mother admitted that she had never complied with the circuit court's June 27, 2023, order to participate in Family Wellness Court and stated that it

13

was because her facility did not help her comply. The mother admitted that she had still not participated in Family Wellness Court as of the date of the trial in April 2024.

The mother also admitted that, in July 2023, she provided no financial support to the father to assist him in meeting the needs of the children. At the time of the trial, the mother worked full time as a manager at a shoe department in a mall in Chattanooga. She testified that she began working there at the end of July 2023. The father filed petitions to terminate the mother's parental rights to the children on August 22, 2023.

The mother initially testified that, at the time of the trial in April 2024, she still lived at the Oxford House in Chattanooga, Tennessee, where she had resided since June 2023. On cross-examination, however, the mother admitted that she no longer lived at the Oxford House. She admitted that she had moved out of the Oxford House with another resident in November 2023 and had moved into an apartment with her. The mother stated that she and her roommate had maintained "connections" and "networking" with the Oxford House after moving out.

14

However, she admitted that she had misled the juvenile court about where she lived.

The mother also admitted that she had not told the truth to the circuit court presiding over her divorce. The mother testified that she had wanted to tell the circuit-court judge in person because he had "been over [her] case for all these years." Thus, she said that, on November 16, 2023, before she left the Oxford House, she "requested court dates," during which she planned to notify the circuit court that she had left the Oxford House. In her filings, which were admitted into evidence in this case, the mother told the circuit court that she had had her probation transferred to Tennessee, that she "still currently reside[d] at a recovery house for women in Chattanooga," and that she had not seen the children at the Gathering Place, although she had called and spoken with its director "numerous, numerous times." As the mother admitted at trial, those motions did not state that she had left or was planning to leave the Oxford House. The mother testified that the circuit court scheduled a hearing; however, because that hearing was continued twice, she admitted that, as of the date of the trial of this case, she had not yet notified the circuit court that she had left the Oxford House.

15

On February 1, 2024, the mother filed in the circuit court a motion for visitation based on an alleged change in her circumstances, namely, the fact that she had resolved her legal issues, had been clean for a longer amount of time, and could not effectively visit with the children by telephone because of interference by the children's stepmother. In that motion, which was admitted into evidence in this case, the mother stated as follows: "The mother has resided at the sober living Oxford House in Chattanooga, Tennessee since June 28, 2023." The mother acknowledged that that statement was not true at the time but said that the statement "was based on [her] last motion."

The mother testified that, at the time of the trial, she still lived in her private apartment. The father testified that he learned for the first time at the trial of this case that the mother was no longer living at the Oxford House. He stated, and the mother admitted, that she had still been telling the children that she lived at the Oxford House.

Because she had moved, the mother admitted that, at the time of the trial, she had not been randomly drug tested since November 2023. She stated, though, that she was willing to take a drug test that day. The mother testified that, on the day before the trial, she had submitted to a

16

drug test as part of the process to apply for a job. According to the mother, she has been clean from drugs since the beginning of her hospital detoxification on April 11, 2023. The mother stated at the trial that, in two days, she would attain one year of sobriety.

The mother testified that, for the entire year of 2023, she was not allowed to visit with the children in person; however, she also stated that the last time she visited the children in person was in the spring of 2023. The mother stated that, at the time of the trial, she had only telephonic visitation, but, she said, she had been blocked on C.W.'s cellular telephone "for months," which prevented her from telephoning C.W. She testified that she had had to message C.W. and have C.W. initiate their calls.

The father testified that the mother had never been blocked on either his, his wife's, or C.W.'s cellular telephone. He stated that the mother "had problems getting through on [C.W.'s] phone" but added that the mother never tried to telephone him or his wife to resolve those problems. The father stated that the mother had not consistently taken advantage of her telephonic visitation. According to the father, the mother called one to four times per week in 2024. He stated that, in 2023,

months passed without the mother calling, although that was rare. Overall, he testified that after he filed the termination-of-parental-rights petitions, the mother's level of effort "changed a lot" with respect to telephonic visitation.

According to the father, in the last two years, the mother attended only one sports game in which one of the children was playing. The mother testified that she had provided the children with Christmas and birthday gifts through her mother and sister. The father testified that he was not aware of the mother providing any birthday gifts to the children. He stated that, so far in 2024, the children had received some movie posters and $50 each from the mother; G.A.W. III had received a pair of shoes; and C.W. had received "a used bag of makeup." The father stated that the only time he or the children had received any money from the mother was the aforementioned instance in which the mother gave the children $50 each. The father testified that the mother gave each of those gifts after the trial of this matter was scheduled.

With respect to the impact of the mother failing to complete rehabilitation, the father testified: "Of course, they love their mom. … They want to see her sometimes. … [I]t has affected them … greatly.

18

[C.W.] has became cold and don't really care anymore, she's kind of just use[d] to it and has became cold towards her and towards other people." The father clarified that C.W. is used to "being in and out of court" and used to the lack of consistent visitation with the mother. He testified that the children need stability.

Later, when discussing the mother's dishonesty regarding where she lived, the father testified that the children will be negatively impacted when they are informed that the mother is not living in The Oxford House and is no longer drug testing. He stated that C.W. has lost hope that the mother will be able to remain sober consistently. He testified that G.A.W. III "holds on to hope, like he clings to just a little bit that's still here, that's still there to hang on to."

The father stated that he believed that it was in the best interests of the children for the mother's parental rights to be terminated. He further testified that the mother's issues with drugs have spanned seven years and that her repeated arrests, going in and out of rehabilitation programs, and failure to comply with court orders for drug counseling have caused G.A.W. III to have "behavioral issues, acting out, mental things."

The father stated that, "[a]t one point in time, [he] was willing to work with a sober" version of the mother. However, when asked what it would take for the mother to prove that she was sober, he stated that "[a]t this point, her being sober [was] irrelevant to [him]." He testified that he was burned out. He stated that after each of the mother's arrests, he had had conversations with her in which she stated that she was going to take care of her issues.

The father admitted that he had also been arrested. He stated that he had struggled with opioid addiction in the past and that he and the mother had used methadone, oxycodone, Xanax, and Suboxone, together. However, he stated that he overcame his addiction, both by spending time in a drug-rehabilitation facility, and ultimately on his own. The father testified that if the mother's parental rights were terminated, he would continue to provide for the children and give them a stable life.

The father testified that he was married and that his wife was a stay-at-home mother to their three children, while he was self-employed as the owner of a business. The father testified that child support "was mentioned" in the divorce proceedings but that he did not pursue it because he did not want it and does not need the mother's money. There

was no testimony given regarding whether the father's wife, or anyone else, planned to adopt the children.

Standard of Review

"A judgment terminating parental rights must be supported by clear and convincing evidence, which is '"'[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.'"' C.O. v. Jefferson Cnty. Dep't of Hum. Res., 206 So. 3d 621, 627 (Ala. Civ. App. 2016) (quoting L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002), quoting in turn Ala. Code 1975, § 6-11-20(b)(4)).

> "'"[T]he evidence necessary for appellate affirmance of a judgment based on a factual finding in the context of a case in which the ultimate standard for a factual decision by the trial court is clear and convincing evidence is evidence that a fact-finder reasonably could find to clearly and convincingly … establish the fact sought to be proved."
>
> "'KGS Steel, Inc. [v. McInish], 47 So. 3d [749,] 761 [(Ala. Civ. App. 2006)].
>
> "'… [F]or trial courts ruling … in civil cases to which a clear-and-convincing-evidence standard of proof applies, "the judge must view the evidence presented through a prism of the substantive evidentiary burden[,]" [Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)]; thus, the appellate court must also

21

look through a prism to determine whether there was substantial evidence before the trial court to support a factual finding, based upon the trial court's weighing of the evidence, that would "produce in the mind [of the trial court] a firm conviction as to each element of the claim and a high probability as to the correctness of the conclusion .'

"Ex parte McInish, 47 So. 3d 767, 778 (Ala. 2008). This court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing. See Ex parte T.V., 971 So. 2d 1, 9 (Ala. 2007). When those findings rest on ore tenus evidence, this court presumes their correctness. Id."

M.W. v. Marshall Cnty. Dep't of Hum. Res., [Ms. CL-2023-0809, Mar. 15, 2024] ___ So. 3d ____, ____ (Ala. Civ. App. 2024).

### Discussion

A juvenile court may terminate parental rights only when the petitioner presents clear and convincing evidence showing: (1) grounds for termination, see § 12-15-319(a), Ala. Code 1975, (2) the absence of a viable alternative to termination, and (3) that the termination will serve the best interests of the child. See J.A. v. S.L., [Ms. CL-2023-0576, June 28, 2024], ___ So. 3d ___ (Ala. Civ. App. 2024). In her appeal, the mother challenges the juvenile court's judgment on all three points. However,

22

we find the issue of whether there was a viable alternative to termination dispositive.

It is well settled that a noncustodial parent continues to maintain a fundamental right to a legal relationship with his or her child. See McQuinn v. McQuinn, 866 So. 2d 570, 572 (Ala. Civ. App. 2003). A juvenile court may only interfere with that fundamental right using the most narrowly tailored means to achieve the State's compelling interests. See Roe v. Conn, 417 F. Supp. 769 (M.D. Ala. 1976). Only two interests have been identified as sufficiently compelling to justify a termination of parental rights: the protection of children from parental abuse or neglect and the advancement of the children's need for a permanent custodial arrangement. See Ex parte Bodie, 377 So. 3d 1051, 1065 (Ala. 2022) (Parker, C.J., concurring specially). If the juvenile court can secure a child in a permanent custodial arrangement that insulates the child from the threat of parental harm, the juvenile court may not terminate the noncustodial parent's parental rights because a viable alternative exists. See J.A. v. S.L., supra.

Ordinarily, when a trial court has vested sole physical custody of a child in one parent, while restricting the visitation rights of the

23

noncustodial parent, to safeguard the children, the State's interests are completely fulfilled, and the trial court has provided the child with a permanent custodial arrangement that secures the child from potential abuse or neglect by the noncustodial parent. Hence, this court has consistently held that, if that custodial arrangement can be continued, the court should maintain the status quo as a viable alternative to termination of parental rights. See A.J.H.T. v. K.O.H., 983 So. 2d 394, 407 (Ala. Civ. App. 2007) (Moore, J., concurring specially) (citing Sutton v. Elrod, 724 So. 2d 551 (Ala. Civ. App. 1998); In re Beasley, 564 So. 2d 959 (Ala. Civ. App. 1990); Miller v. Knight, 562 So. 2d 274 (Ala. Civ. App. 1990); Talley v. Oliver, 628 So. 2d 690 (Ala. Civ. App. 1993); S.M.W. v. J.M.C., 679 So. 2d 256 (Ala. Civ. App. 1996); and Thornton v. Thornton, 519 So. 2d 960 (Ala. Civ. App. 1987)). In a private termination-of-parental-rights case, when a juvenile court terminates parental rights despite the viability of maintaining the status quo, this court has regularly reversed the judgment. See, e.g., J.A. v. S.L., supra; J.G. v. Lauderdale Cnty. Dep't of Hum. Res., 379 So. 3d 444 (Ala. Civ. App. 2023); J.C.D. v. Lauderdale Cnty. Dep't of Hum. Res., 180 So. 3d 900, 901 (Ala. Civ. App. 2015).

Here, under the status quo, the children resided safely with the father according to a permanent sole physical custody arrangement; they visited telephonically with the mother; and the mother was permitted to visit with them in person at the Gathering Place, although she had not yet arranged a meeting there. The father testified that he had given the children a stable life and had met all of their needs without assistance from the mother. There was no evidence indicating that continued telephonic visitation or supervised in-person visitation with the mother would be harmful to the children.

We recognize that denying the father's petitions would have left open the possibility that, in the future, the mother could be awarded unsupervised visitation with the children, which, in light of her substance abuse problems and criminal history, could harm the children. We note, however, that the children were protected under the current supervised visitation arrangement, and the mother could not be awarded unsupervised visitation except upon a showing that she had adjusted her circumstances such that unsupervised visitation would not be harmful to the children. Therefore, maintaining the status quo satisfied the State's interests and was a viable alternative to the termination. Accordingly,

the juvenile court should have denied the father's petitions. See A.J.H.T., 983 So. 2d at 407 (Moore, J., concurring specially) (citing Sutton, 724 So. 2d 551; In re Beasley, 564 So. 2d 959; Miller, 562 So. 2d 274; Talley, 628 So. 2d 690; S.M.W., 679 So. 2d 256; and Thornton, 519 So. 2d 960)).

Having determined that there was a viable alternative to the termination of the mother's parental rights, we pretermit a discussion of whether there were grounds for termination of the mother's parental rights and whether the termination served the best interests of the children. Even if it did, the juvenile court could not terminate the mother's parental rights when there was a viable alternative. See Ex parte T.V., 971 So. 2d 1 (Ala. 2007).

## Conclusion

Based on the foregoing, we reverse the juvenile court's judgments terminating the mother's parental rights and remand the causes for the entry of judgments denying the father's petitions to terminate the mother's parental rights.

CL-2024-0344 -- REVERSED AND REMANDED WITH INSTRUCTIONS.

CL-2024-0345 -- REVERSED AND REMANDED WITH INSTRUCTIONS

Moore, P.J., and Edwards, Hanson, Fridy, and Lewis, JJ., concur.